**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT COURT OF WEST VIRGINIA
MARTINSBURG DIVISION**

JOHN PAUL LYNCH on behalf
of himself and "E.L.," a minor, on their own
and on behalf of all others
similarly situated,

          **Plaintiffs,**

v.

3M COMPANY (F/K/A Minnesota Mining
and Manufacturing Co.), TYCO FIRE
PRODUCTS L.P., successor-in-interest to
THE ANSUL COMPANY, NATIONAL
FOAM, INC., BUCKEYE FIRE EQUIPMENT
CO., CHEMGUARD, E.I DUPONT DE NEMOURS
& CO., AND THE CHEMOURS CO., LLC,

          **Defendants.**

> ELECTRONICALLY
> FILED
> May 03 2021
> U.S. DISTRICT COURT
> Northern District of WV

Civil Action No. 3:21-CV-66 (Groh) _____

### CLASS ACTION COMPLAINT

Plaintiffs, John Paul Lynch, individually and on behalf of and "E.L.," a minor, on their

own behalf and on behalf of all others similarly situated, by and through their undersigned

counsel, Stephen G. Skinner and the Skinner Law Firm, and Anthony Majestro and Powell &

Majestro, hereby file this Class Action Complaint, against Defendants, THE 3M COMPANY

(f/k/a Minnesota Mining and Manufacturing, Co), TYCO FIRE PRODUCTS L.P., successor-in-

interest to THE ANSUL COMPANY; NATIONAL FOAM; BUCKEYE FIRE PROTECTION

CO.; CHEMGUARD; DUPONT; and CHEMOURS.

## INTRODUCTION

1.      Aqueous Film Forming Foam ("AFFF") is a specialized substance designed to extinguish petroleum-based fires. It has been used for decades and continues to be used by military firefighters to put out fires and in training and response exercises in preparation for fires.

2.      AFFF contains synthetic, toxic per- and polyfluoroalkyl substances collectively known as "PFAS."[1] PFAS bind to proteins in the blood of animals and humans exposed to such materials and not only remain and persist over long periods of time, but, due to their unique chemical structure, accumulate and build up in the blood/body of the exposed individuals with each additional exposure, no matter how small. PFAS can travel long distances, move through soil, seep into groundwater, or be carried through air.

3.      Defendants collectively designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold and/or otherwise handled and/or used AFFF with knowledge that it contained highly toxic and long lasting PFASs, which would contaminate Plaintiffs' blood and/or body with PFAS, and the resultant biopersistence and bioaccumulation of such PFAS in the blood and/or body of Plaintiff.

4.      In May 2014, the City of Martinsburg conducted PFOS/PFOA sampling of its water supply under the Unregulated Contaminant Monitoring Rule Phase 3 ("UCMR3") and detected PFOS in the Big Springs well at 74 parts per trillion (ppt). Another test in May 2016

---

[1] "PFAS" includes but is not limited to perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS") and related chemicals, including but not limited to those that degrade to PFOA and/or PFOS, and including but not limited to C3-C-15 PFAS chemicals, such as perfluorohexanesulfonate (PFHxS), perfluorononanoate (PFNA), perfluorobutanesulfonate (PFBS), perfluorohexanoate (PFHxA), perfluoroheptanoate (PFHpA), perfluoroundecanoate (PFUnA), perfluorododecanoate (PFDoA), HFPA Dimer Acid (CAS # 13252 -13-6/C3 Dimer Acid/P-08-508/FRD903/GX903/C3DA/GenX), and HFPA Dimer Acid Ammonium Salt (CAS#62037-80-3/ammonium salt of C3 Dimer Acid/P-08- 509/FRD902/GX903/GenX)

showed PFOA at 114 ppt and PFOA at 20 ppt, above the current Environmental Protection Agency Health Advisory of 70 ppt.

5.      The Plaintiffs then conducted testing of their well water which indicated the presence of PFAS in the water.

6.      The testing showed that the Plaintiffs had been exposed to AFFF containing PFAS through their drinking water and suffered personal injuries as a result.

7.      This action is brought by Plaintiffs, John Paul Lynch individually and on behalf of minor E.L., for injunctive, equitable, and declaratory relief for injuries arising from the intentional, knowing, reckless and/or negligent acts and/or omissions of Defendants in connection with contamination of the blood and/or body of Plaintiffs and all others similarly situated with PFAS through the design, marketing, development, manufacture, distribution, release, training, and sale of AFFF containing PFAS.

## JURISDICTION AND VENUE

8.      Court has jurisdiction over the subject matter of this Complaint, pursuant to 28 U.S.C. §1332(a), as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

9.      Venue is proper in the United States District Court for the Northern District of West Virginia pursuant to 28 U.S.C. § 1391 because it is the judicial district in which Plaintiffs are residents and citizens, a substantial part of events or omissions giving rise to the claims occurred, and Defendants conduct business within this district.

## PARTIES

10.    Plaintiff John Paul Lynch and the minor "E.L." are residents of Berkeley County, West Virginia. Their house is approximately ¼ of a mile from the Air Base and uses well water sourced from groundwater in Buzzard Run, a stream in close proximity to the Air Base.  Lynch brings this action individually and on behalf of minor "E.L." for medical monitoring, personal injuries, and property damage sustained as a result of exposure due to Defendants' AFFF containing PFAS.

11.    Defendant, 3M Company, f/k/a Minnesota Mining and Manufacturing Company, ("3M"), is a Delaware corporation and does business throughout the United States, including conducting business in West Virginia. 3M has its principal place of business at 3M Center, St. Paul, Minnesota 55133.

12.    3M designed, marketed, developed, manufactured, distributed released, trained users, produced instructional materials, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint, including in West Virginia, in such a way as to result in the contamination of Plaintiffs' blood and/or body with PFAS, and the biopersistence and bioaccumulation of such PFAS in their blood and/or body.

13.    Defendant Tyco Fire Products, L.P., successor in interest to The Ansul Company ("Tyco"), is a Delaware corporation and does business throughout the United States, including conducting business in West Virginia. Tyco has its principal place of business at One Stanton Street, Marinette, Wisconsin 54143. Tyco manufactured and currently manufactures the Ansul brand of products, including Ansul brand AFFF containing PFAS.

14.     Tyco is the successor in interest to the corporation formerly known as The Ansul Company ("Ansul"). At all times relevant, Tyco/Ansul designed, marketed, developed, manufactured, distributed released, trained users, produced instructional materials, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint, including in West Virginia, in such a way as to result in the contamination of Plaintiffs' blood and/or body with PFAS, and the biopersistence and bioaccumulation of such PFAS in their blood and/or body.

15.     Defendant Buckeye Fire Equipment Company ("Buckeye") is a North Carolina corporation and does business throughout the United States, including conducting business in West Virginia. Buckeye has its principal place of business at 110 Kings Road, Mountain, North Carolina 28086.

16.     Buckeye designed, marketed, developed, manufactured, distributed released, trained users, produced instructional materials, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint, including in West Virginia, in such a way as to result in the contamination of Plaintiffs' blood and/or body with PFAS, and the biopersistence and bioaccumulation of such PFAS in their blood and/or body.

17.     Defendant Chemguard is a Wisconsin corporation and does business throughout the United States, including conducting business in West Virginia. Chemguard has its principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

18.     Chemguard designed, marketed, developed, manufactured, distributed released, trained users, produced instructional materials, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the

subject of this Complaint, including in West Virginia, in such a way as to result in the contamination of Plaintiffs' blood and/or body with PFAS, and the biopersistence and bioaccumulation of such PFAS in their blood and/or body.

19.     Defendant National Foam, Inc. ("National Foam") is a Delaware corporation and does business throughout the United States, including conducting business in West Virginia. National Foam has its principal place of business at 350 East Union Street, West Chester, Pennsylvania 19382.

20.     National Foam designed, marketed, developed, manufactured, distributed released, trained users, produced instructional materials, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint, including in West Virginia, in such a way as to result in the contamination of Plaintiffs' blood and/or body with PFAS, and the biopersistence and bioaccumulation of such PFAS in their blood and/or body.

21.     Defendant, E. I. du Pont de Nemours & Co. ("DuPont"), is a Delaware corporation and does business throughout the United States, including conducting business in West Virginia. DuPont has its principal place of business at 1007 Market Street, Wilmington, Delaware 19898.

22.     DuPont designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint, including in West Virginia, in such a way as to result in the contamination of Plaintiffs' and/or body with PFAS, and the biopersistence and bioaccumulation of such PFAS in their blood and/or body.

23.     Defendant, The Chemours Company, L.L.C. ("Chemours"), is a Delaware corporation and does business throughout the United States, including conducting business in West Virginia. Chemours has its principal place of business 1007 Market Street, Wilmington, Delaware 19898.

24.     Chemours designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint, in such a way as to result in the contamination of Plaintiffs' blood and/or body with PFAS, and the biopersistence and bioaccumulation of such PFAS in their blood and/or body.

25.     When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment or agency.

26.     The term "Defendant" or "Defendants" refers to all Defendants named herein jointly and severally.

## GENERAL FACTUAL ALLEGATIONS

27.     AFFF is a mixture of chemicals, including PFAS, used to put out petroleum-based fuel and other flammable liquid fires. AFFF lowers surface tension of the fuel, which starves a fire of its oxygen supply. While the fluorinated compounds in AFFF work well to extinguish fires, they are not biodegradable. These toxic chemicals accumulate and contaminate the bodies of animals and humans who come in contact with or consume them.

28.     Defendants designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled AFFF containing toxic PFAS that were used at hundreds of military bases around the country, including the Air National Guard Base in Martinsburg, West Virginia.

29.     Defendants have each designed, marketed, developed, distributed, sold, manufactured, released, trained users on, produced instructional materials for, and/or otherwise handled and/or used AFFF containing PFAS, including in West Virginia, in such a way as to cause the contamination of Plaintiffs' blood and/or body with PFAS, and the resultant biopersistence and bioaccumulation of such PFAS in the blood and/or body of Plaintiff.

30.     Prior to commercial development and large-scale manufacture and use of AFFF containing PFAS, no such PFAS had been found, detected, or were present in human blood.

31.     By at least the end of the 1960s, animal toxicity testing performed by Defendants manufacturing and/or using PFAS indicated that exposure to such materials, including at least PFOA, resulted in various adverse health effects among multiple species of laboratory animals, including toxic effects to the liver, testes, adrenals, and other organs and bodily systems.

32.     By at least the end of the 1960s, additional research and testing performed by Defendants manufacturing and/or using PFAS indicated that such materials, including at least PFOA, because of their unique chemical structure, were resistant to environmental degradation and would persist in the environment essentially unaltered if allowed to enter the environment.

33.     By at least the end of the 1970s, additional research and testing performed by Defendants manufacturing and/or using PFAS indicated that one or more such materials, including at least PFOA and PFOS, because of their unique chemical structure, would bind to proteins in the blood of animals and humans exposed to such materials where such materials

would not only remain and persist over long periods of time but would accumulate and build up in the blood/body of the exposed individuals with each additional exposure, no matter how small.

34.    Defendants manufacturing and/or using AFFF containing PFAS released such PFAS into the environment during, as a result of, or in connection with their manufacturing and other commercial operations, including into the air, surface waters, ground water, soils, landfills, and/or through their involvement and/or participation in the creation of consumer or other commercial products and materials and related training and response and instructional materials and activities, including in West Virginia, that Defendants knew, foresaw, and/or reasonably should have known and/or foreseen would expose Plaintiffs to such PFAS.

35.    By at least the end of the 1970s, Defendants manufacturing and/or using PFAS, including at least DuPont and 3M, were aware that PFAS, including at least PFOA and PFOS, had been detected not only in the blood of workers at PFAS manufacturing facilities, but in the blood of the general population of the United States in people not known to be working at or living near PFAS manufacturing and/or use facilities, indicating to such Defendants that continued manufacture and use of such PFAS materials would inevitably result in continued and increased levels of PFAS getting into the environment and into human blood across the United States, even in areas nowhere near or associated with specific PFAS manufacturing or use facilities.

36.    By at least the end of the 1980s, additional research and testing performed by Defendants manufacturing and/or using PFAS indicated that at least one such PFAS, PFOA, had caused Leydig cell (testicular) tumors in a chronic cancer study in rats, resulting in at least one such Defendant, DuPont, classifying such PFAS internally as a confirmed animal carcinogen and possible human carcinogen.

37.    It was understood by Defendants by at least the end of the 1980s that a chemical that caused cancer in animal studies must be presumed to present a cancer risk to humans, unless the precise mechanism of action by which the tumors were caused was known and it was known that such mechanism of action would not be operative and/or occur in humans.

38.    By at least the end of the 1980s, scientists had not determined the precise mechanism of action by which any PFAS caused tumors and thus prevailing scientific principles of carcinogenesis classification mandated that Defendants presume any such PFAS material that caused tumors in animal studies could present a potential cancer risk to exposed humans.

39.    By at least the end of the 1980s, additional research and testing performed by Defendants manufacturing and/or using PFAS, including at least DuPont, indicated that elevated incidence of certain cancers and other adverse health effects, including elevated liver enzymes and birth defects, had been observed among workers exposed to such materials, including at least PFOA, but such data was not published, provided to governmental entities as required by law, or otherwise publicly disclosed at the time.

40.    By at least the end of the 1980s, Defendants, including at least 3M and DuPont, understood that, not only did these PFAS, including at least PFOA and PFOS, get into and persist and accumulate in human blood and in the human body, but that once in the human body and blood, particularly the longer-chain PFAS, such as PFOS and PFOA, had a long half-life, meaning that they would take a very long time (years) before even half of the material would start to be eliminated (assuming no further exposures), which allowed increasing levels of the chemicals to build up and accumulate in the blood and/or body of exposed individuals over time, particularly if any level of exposures continued.

41.     By at least the end of the 1990s, additional research and testing performed by Defendants manufacturing and/or using PFAS, including at least 3M and DuPont, indicated that at least one such PFAS, PFOA, had caused a triad of tumors (Leydig cell (testicular), liver, and pancreatic) in a second chronic cancer study in rats.

42.     By at least the end of the 1990s, the precise mechanism(s) of action by which any PFAS caused each of the tumors found in animal studies had still not been identified, mandating that Defendants continue to presume that any such PFAS that caused such tumors in animal studies could present a potential cancer risk to exposed humans.

43.     By at least 2010, additional research and testing performed by Defendants manufacturing and/or using PFAS, including at least 3M and DuPont, revealed multiple potential adverse health impacts among workers exposed to such PFAS, including at least PFOA, such as increased cancer incidence, hormone changes, lipid changes, and thyroid and liver impacts, which such Defendants' own scientists, lawyers, and advisors recommended be studied further to assess the extent to which PFAS exposures were causing those effects.

44.     When the United States Environmental Protection Agency ("USEPA") and other state and local public health agencies and officials first began learning of PFAS exposures in the United States and potential associated adverse health effects, Defendants repeatedly assured and represented to such entities and the public that such exposures presented no risk of harm and were of no legal, toxicological, or medical significance of any kind.

45.     After USEPA and other entities began asking Defendants to stop manufacturing and/or using certain PFAS, Defendants began manufacturing and/or using and/or began making and/or using more of certain other and/or "new" PFAS, including PFAS materials with six or fewer carbons, such as GenX (collectively "Short-Chain PFAS").

11

46.    Defendants manufacturing and/or using Short-Chain PFAS, including at least DuPont and 3M, are aware that one or more such Short-Chain PFAS materials have also been found in human blood.

47.    By at least the mid-2010s, Defendants, including at least DuPont and Chemours, were aware that at least one Short-Chain PFAS had been found to cause the same triad of tumors (Leydig (testicular), liver, and pancreatic) in a chronic rat cancer study as had been found in a chronic rat cancer study with a non-Short-Chain PFAS.

48.    As of today's date, the precise mechanism(s) of action by which any PFAS causes each of the tumors found in animal studies has not yet been identified, mandating that Defendants presume that any such PFAS that caused such tumors in animal studies be presumed to present a potential cancer risk to exposed humans.

49.    Research and testing performed by and/or on behalf of Defendants making and/or using Short-Chain PFAS indicates that such Short-Chain PFAS materials present the same, similar, and/or additional risks to human health as had been found in research on other PFAS materials, including cancer risk.

50.    Nevertheless, Defendants repeatedly assured and represented to governmental entities and the public (and continue to do so) that the presence of PFAS, including these Short-Chain PFAS, in human blood at the levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance of any kind.

51.    As of today's date, Defendants, through their membership in the FluoroCouncil, represent to the public through the FluoroCouncil website that: "The newer, short-chain chemistries currently in use are well studied [and] ... [t]he science supports the conclusion that

the newer FluoroTechnology is not expected to present a significant risk to humans and the environment."

52.    At all relevant times, Defendants, individually and/or collectively, have had the resources and ability but have intentionally, purposefully, recklessly, and/or negligently chosen not to fund or sponsor any study, investigation, testing, and/or other research of any kind of the nature Defendants claim is necessary to confirm and/or prove that the presence of any one and/or combination of PFAS in human blood causes any disease and/or adverse health impact of any kind in humans, presents any risk of harm to humans, and/or is of any legal, toxicological, or medical significance to humans, according to standards Defendants deem acceptable.

53.    Even after an independent science panel, known as the "C8 Science Panel," publicly announced in the 2010s that human exposure to 0.05 parts per billion or more of one PFAS, PFOA, in drinking water for one year or more had "probable links" with certain human diseases, including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medically-diagnosed high cholesterol, Defendants repeatedly assured and represented to governmental entities, their customers, and the public (and continue to do so) that the presence of PFAS in human blood at the levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance of any kind, and have represented to and assured such governmental entities, their customers, and the public (and continue to do so) that the work of the independent C8 Science Panel was inadequate to satisfy the standards of Defendants to prove such adverse effects upon and/or any risk to humans with respect to PFAS in human blood.

54.    At all relevant times, Defendants shared and/or should have shared among themselves all relevant information relating to the presence, biopersistence, and bioaccumulation

of PFAS in human blood and associated toxicological, epidemiological, and/or other adverse effects and/or risks.

55.     As of the present date, blood serum testing and analysis by Defendants, independent scientific researchers, and/or government entities has confirmed that PFAS materials are clinically demonstrably present in approximately 99% of the current population of the United States.

56.     There is no naturally-occurring "background," normal, and/or acceptable level or rate of any PFAS in human blood, as all PFAS detected and/or present in human blood is present and/or detectable in such blood as a direct and proximate result of the acts and/or omissions of Defendants.

57.     Data exists to indicate that the presence, accumulation, toxic invasion, and/or persistence of PFAS in human blood, including that of Plaintiff, is injurious and physically harmful and results in unwanted, unconsented-to, and deleterious alterations, changes, and/or other presently-existing physical injury and/or adverse impacts to the blood and/or body of Plaintiff, including but not limited to subcellular injuries, including but not limited to biopersistence and bioaccumulation within the body.

58.     At all relevant times, Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing Plaintiffs from discovering the existence and extent of any injuries/harm as alleged herein.

59.   At all relevant times, Defendants, through their acts and/or omissions, took steps to attack, challenge, discredit, and/or otherwise undermine any scientific studies, findings, statements, and/or other information that proposed, alleged, suggested, or even implied any potential adverse health effects or risks and/or any other fact of any legal, toxicological, or medical significance associated with the presence of PFAS in human blood.

60.   At all relevant times, Defendants, through their acts and/or omissions, concealed and/or withheld information from their customers, governmental entities, and the public that would have properly and fully alerted Plaintiffs to the legal, toxicological, medical, or other significance and/or risk from having any PFAS material in their blood.

61.   At all relevant times, Defendants encouraged the continued and even further increased use and release into the environment of PFAS, including into West Virginia, by their customers and others, including but not limited to through manufacture, use, and release, of AFFF containing PFAS and/or emergency responder protection gear or equipment coated with materials made with or containing PFAS, and tried to encourage and foster the increased and further use of PFAS, including in West Virginia, in connection with as many products/uses/and applications as possible, despite knowledge of the toxicity, persistence, and bioaccumulation concerns associated with such activities.

62.   Once governmental entities and regulators began learning of the potential toxicity, persistence, and bioaccumulation concerns associated with PFAS, Defendants cited to the pervasive use of such PFAS throughout numerous sectors of the American economy (which they had intentionally and purposefully encouraged and created) and the widespread presence of PFAS in blood of Americans (which they also had negligently, recklessly, and/or intentionally

caused) as an excuse and/or reason not to restrict or regulate PFAS, essentially arguing that the issues associated with PFAS had become "too big to regulate."

63.     To this day, Defendants deny that the presence of any PFAS in human blood, at any level, is an injury or presents any harm or risk of harm of any kind, or is otherwise of any legal, toxicological, or medical significance.

64.     To this day, Defendants deny that any scientific study, research, testing, or other work of any kind has been performed that is sufficient to suggest to the public that the presence of any PFAS material in human blood, at any level, is of any legal, toxicological, medical, or other significance.

65.     Defendants, to this day, affirmatively assert and represent to governmental entities, their customers, and the public that there is no evidence that any of the PFAS found in human blood across the United States causes any health impacts or is sufficient to generate an increased risk of future disease sufficient to warrant diagnostic medical testing, often referring to existing studies or data as including too few participants or too few cases or incidents of disease to draw any scientifically credible or statistically significant conclusions.

66.     Defendants, to this day, use and rely upon what they claim is this same "lack of definitive evidence of causation" as between any PFAS and any adverse human health effect to oppose and try to discourage regulatory and/or legislative efforts to limit, restrict, and/or address PFAS impacts to the environment or human health, and to oppose, reject, and deny claims that PFAS has caused any injury or increased the risk of any adverse human health effects.

67.     Yet, to this day, Defendants knowingly, willfully, purposefully, intentionally, recklessly, and/or negligently refuse to fund or conduct any scientific study, research, testing, and/or other work of any kind that is extensive or comprehensive enough, according to

Defendants, to generate results that Defendants will accept (outside the context of an existing written settlement agreement such as DuPont entered with respect to certain PFOA exposures, which created the C8 Science Panel) as sufficient to confirm a causal connection between any single or combination of PFAS in human blood and any injury, human disease, adverse human health impact, and/or a risk sufficient to warrant any personal injury compensation or future diagnostic medical testing, including medical monitoring.

68.    Defendants were and/or should have been aware, knew and/or should have known, and/or foresaw or should have foreseen that their marketing, development, manufacture, distribution, release, training and response of users, production of instructional materials, sale and/or other handling and/or use of AFFF containing PFAS, including in West Virginia, would result in the contamination of the blood and/or body of Plaintiffs with PFAS, and the biopersistence and bioaccumulation of such PFAS in their blood and/or body.

69.    Defendants were and /or should have been aware, or knew and/or should have known, and/or foresaw or should have foreseen that allowing PFAS to contaminate the blood and/or body of Plaintiffs would cause injury, irreparable harm, and/or unacceptable risk of such injury and/or irreparable harm to Plaintiffs.

70.    Defendants did not seek or obtain permission or consent from Plaintiffs before engaging in such acts and/or omissions that caused, allowed, and/or otherwise resulted in Plaintiffs' exposure to AFFF and the contamination of Plaintiffs' blood and/or body with PFAS materials, and resulting biopersistence and bioaccumulation of such PFAS in their blood and/or body.

## Contamination in Berkeley County, West Virginia

71.    For decades, the United States Air Force and Air National Guard has stored and used AFFF containing PFAS in firefighter training and response exercises at the 167th Air Wing at Shepherd Field Air National Guard Base ("167th AW") in Martinsburg, West Virginia. The AFFF containing PFAS, which was designed, manufactured, marketed, distributed and/or sold by Defendants, was expected to, and did, reach the Shepherd Field Air National Guard Base in Martinsburg, West Virginia, without substantial change in the condition in which it was sold to the Air Force.

72.    The descriptive labels and data sheets for the AFFF containing PFAS utilized at the 167th AW Base in Martinsburg, West Virginia, did not reasonably or adequately describe the hazards of AFFF containing PFAS. Defendants knew or should have known of these hazards when the product was distributed. Defendants manufactured, designed, marketed, distributed, and/or sold the AFFF knowing that the PFAS contained in the AFFF presented an unreasonable risk to human health and are inherently dangerous.

73.    Plaintiffs' home is near Buzzard's Run (which is shown on the map below) and Shepherd Air National Guard Base, which is at the Eastern Regional Airport in Martinsburg, West Virginia.

74.    This site has been linked to the contamination of surface and groundwater with PFOA, PFOS, and other perfluorinated chemicals ("PFCs"). On the base itself, ten (10) "Areas of Concern" were identified by military and state officials as being the most likely sources of contamination. Buzzard Run was one such area.

75.     PFOA has been detected in levels exceeding the current EPA Health Advisory Limit of 70 parts per trillion (ppt) in the City of Martinsburg and aquifer that provides water to communities through both municipal water systems and private wells.

76.     Monitoring conducted in 2014 by the City of Martinsburg, pursuant to EPA's Unregulated Contaminant Monitoring Rule, revealed detections of PFOS in the filtration plant's Big Springs Deep Well, but at levels below the then current EPA recommended thresholds. When EPA updated the PFOS/PFOA thresholds in May 2016, these prior detections became problematic and the West Virginia Bureau for Public Health advised the deep well's use be discontinued. The West Virginia Department of Environmental Protection's Division of Water and Waste Management ("DWWM") then began investigating the source of PFOS contamination in Martinsburg's deep well.

77.     DWWM geologists and hydrologists researched available geologic publications and spoke with US Geological Survey staff who had actively studied the areas groundwater hydrology.

78.     On June 1 and 2, 2016, DWWM staff mobilized and sampled water from 9 wells, 1 spring, and 6 stream locations. Samples were analyzed by Eurofins-Lancaster Laboratories in Lancaster, PA. The lab is certified by the WVDEP Laboratory Certification Program for Perfluorinated Compounds Analysis.

79.     The sampling strategy was to sample both wells and streams in the perimeter surrounding the Big Springs Well, looking for hotspots, keeping in mind four possible sources of PFOS contamination. The four possible sources identified during the investigation were a large tire fire near Inwood, WV, a truck wreck and fire near I-81, the historic textile industry in Martinsburg, and the 167th Air Guard facility.

80.    Sampling results are shown on the figure below, in general terms PFOS/PFOA was found at the highest concentrations in Cold Springs Run (6 and 7), Evans Run (8) and the Big Springs Well (2).



81.    As the above figure shows, "Buzzard Run @ Airport Rd Grab" (4) was found to have, at that point in time, a combined 26 ng/L of PFOA and PFOS flowing through it.

82.    While sampling was being conducted, DWWM staff also met with 167th Air Guard Base personnel. Base personnel provided a report titled *Perfluorinated Compounds Preliminary Assessment, Site Visit Report, December 2015* which detailed historic use of PFOS at the 167th Base.

83.    Importantly, two areas of the report stood out. One was a former fire training pit on the Base which had been previously remediated for traditional organic compounds. The second was at Hangar 119, Hangar 128, and Hangar 110 where both spills of Aqueous Film Forming Foams (AFFF) and periodic fire suppression system testings reportedly occurred. Hangars discharged through an oil-water separator into Cold Springs Run. Given the high solubility of the PFOS and PFOA family of compounds, little if any treatment would be expected from the oil-water separator prior to its discharge into Cold Springs Run.

84.    Specific to the fire training pit, the report stated on pages 3 and 4:

IRP Site 4 was an open, gravel-bottomed, elliptical bermed pit, located north of Taxiway A. Flammable liquids were poured into the pit and were ignited for fire-training exercises. The pit measured approximately 20 by 30 feet and was lined with several layers of thick plastic sheeting that degraded over time. Approximately 75 feet north of the pit, the ground slopes steeply toward a man-made drainage ditch. Water that accumulated in the pit was sometimes drained from the pit into the nearby drainage ditch. The remedial action, including excavation, on-site thermal treatment of contamination, and confirmation monitoring, was completed in 1996, and it was determined that contaminant levels at the site posed negligible risk to public health and the environment. The West Virginia Department of Environmental Protection reviewed the sampling results which confirmed that all contaminant levels were below target clean up levels, and determined that no further action was required (AMEC, 2002). However, PFCs were not contaminants of concern during IRP investigations. As such, soil and/or groundwater samples were not analyzed for PFCs.

85.    Specific to Hangars 119, 128, and 110 the report stated:

### 3.1.1  Hangar 119

Hangar 119 was constructed in the 1960s and was equipped with an AFFF fire suppression system from approximately 1989 until 2007. The suppression system was designed to contain, store, and in the case of system engagement, ultimately discharge the AFFF inside the hangar.

In 2007, Hangar 119 was converted to house various functions such as Civil Engineering (CE) and Environmental Management and the AFFF fire suppression system was removed. AFFF from the 2007 removal was turned in to the Defense Reutilization and Marketing Office (DRMO) and sent to Battle Creek, Michigan.

One spill was reported while the system was in place. The spill occurred in the 1990s and consisted of an approximate 500-gallon release to the hangar floor. The AFFF was hosed down the sanitary sewer drains which were connected to an oil/water separator (OWS) as was the case with all the hangars at that time. Prior to 2007, the sanitary drains inside Hangar 119 were connected to the Base's wastewater treatment plant (WWTP) which discharged its effluent into the storm water drainage system which flows toward Cold Spring Run. According to Base personnel, sludge from the WWTP was sent off-site to a landfill for disposal and therefore not disposed on Base. The WWTP was demolished in 2007 and the sanitary sewer connected to the City of Martinsburg.

Other Hangar 119 releases of AFFF occurred during fire suppression system tests. It was estimated by Base personnel that an AFFF fire suppression system test took place approximately

every five years. Approximately 100-200 gallons of AFFF was released during each test. As indicated above, prior to 2007, AFFF from system tests was discharged to the Base WWTP (see Section 3.1.12 for additional information on the WWTP).

### 3.1.2   Former Hangar 128

The former location of Hangar 128 is shown on Figure 2. The hangar was constructed in the 1980s and was demolished in 2008. Hangar 128 was equipped with an AFFF fire suppression system until decommissioning prior to demolition. The suppression system was designed to contain, store, and in the case of system engagement, ultimately discharge the AFFF inside the hangar. According to CE drawings, the hangar drained to the sanitary sewer which, prior to 2007, was connected to the Base WWTP which discharged to the storm water drainage system.

In the 1990s, approximately 500 gallons of AFFF was released to the hangar floor. The AFFF was hosed down the sanitary sewer drains which were connected to an OWS as was the case with all the hangars at that time. However, prior to 2007 the sanitary sewer drains inside Hangar 119 were connected to the Base's WWTP which discharged its effluent into the storm water drainage system which flows toward Cold Spring Run. The WWTP was demolished in 2007 and the sanitary sewer connected to the City of Martinsburg.

Other Hangar 128 releases of AFFF occurred during fire suppression system tests. It was estimated by Base personnel that an AFFF fire suppression system test took place approximately every five years. Approximately 100-200 gallons of AFFF was released during each test. As indicated above, prior to 2007, AFFF from system tests was discharged to the Base WWTP.

### 3.1.3   Former Hangar 110

Building 110 was constructed in the 1950s and demolished in 2011. The building was used as a hangar and was equipped with a AFFF fire suppression system. The installation date for the AFFF fire suppression system is not known; however, the system was decommissioned prior to demolition. As with other buildings at the Base, Hangar 110's floor drains discharged to the sanitary sewer system prior to 2007 when it was connected to the Base WWTP. Effluent from the Base WWTP was discharged to the storm water drainage system. The WWTP was demolished in 2007 and the sanitary sewer connected to the City of Martinsburg.

86.     DWWM executed a surface and groundwater sampling strategy designed to encircle the Big Springs Deep Well, using approved analytic methods, and with favorable

23

equipment rinse and trip sample blanks. Combining these analyses with available geologic information and information on PFOS usage in the area, the 167th Base is believed to be the largest and most probable source of the PFOS contamination in Martinsburg's Big Springs Deep Well, according to DWWM, and by extension, the source of PFOA and PFOS contamination in Buzzard Run.

87.    Plaintiff John Paul Lynch has lived in his home on Airport Road since October 1998, and raised his children there, one of whom is minor Plaintiff "E.L."  Plaintiff sourced his home water from a private well, which draws from the groundwater and Buzzard Run. A blood test revealed that he has PFCs in his blood system.

88.    In December 2019, Plaintiffs' well water was tested.  The test indicated the presence of PFAS in their drinking water.

89.    The source of the contamination of his property was the AFFF used at Shepherd Field near his home which contaminated the groundwater and the water in Plaintiffs' well.

## CLASS ALLEGATIONS

90.    The Plaintiffs, for themselves and on behalf of a Class of similarly-situated individuals, bring this action seeking to recover damages for injuries to their property, person, and for medical monitoring resulting from their use of PFOS- and PFOA- containing AFFF products and/or from exposure to groundwater, surface water, and affected areas contaminated with PFOS and/or PFOA at the 167th Air Wing Shepherd Air National Guard Base from AFFF products that were manufactured, designed, sold, supplied and/or distributed by each of the above-named Defendants.

91.     Plaintiffs and members of the proposed Class are residents of Berkeley County, West Virginia who live or own property in a "Zone of Contamination" and have been damaged through the contamination of their private drinking water supplies with PFAS, and other chemicals contained in the AFFF. and/or the diminution of their property values due to the widespread contamination of properties with PFAS.

92.     The Zone of Contamination is those areas in a 1-mile radius of Shepherd Field and a 1-mile radius of each of the wells that indicated the presence of PFAS as shown in paragraphs 80 above.  The boundaries of the Zone of Contamination as the extent of the PFAS contamination may expand beyond or modified and require amendment or modification.

93.     Plaintiffs propose three classes and seek to certify and maintain this action as a class action under Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of Civil Procedure, subject to amendment and additional discovery. The proposed classes sub-classes, and the Plaintiffs who seek to represent those classes, are as follows:

a.      **Injury Class**: All natural persons who sustained bioaccumulation of PFOS and/or PFOA in their bodies and who have suffered personal injury as a result of their exposure to the PFOS- and/or PFOA- contaminated water from private wells and surrounding groundwater.

b.      **Medical Monitoring Class**: All natural persons who sustained bioaccumulation of PFOS and/or PFOA in their bodies and were exposed to PFOS- and/or PFOA- contaminated water from private wells and surrounding groundwater.

c.      **Property Damage Class:** All natural persons who own or occupy real property in Berkeley County whose property has been contaminated with PFAS. This class can be readily ascertained by county property records.

94.     Excluded from the Classes are:

a.      Defendants, their officers, directors, management, legal representatives, employees, assigns, heirs, successors, and wholly owned or partly owned subsidiaries and affiliates;

b.      Any judges or justices involved in this action and any members of their immediate families;

c.      Any Class counsel or their immediate family members; and

d.      All governmental entities.

95.     Plaintiffs reserve the right to amend the Class and Sub-Class definition if discovery and further investigation reveal that any Class should be expanded, divided into additional sub- classes, or modified in any other way.

### Numerosity and Ascertainability

96.     This action meets the numerosity requirement of Fed. R. Civ. P. 23(a)(1) because the number of impacted individuals, upon information and belief, has reached the thousands making individual joinder of class members' respective claims impracticable. While the exact number of Class members is not yet known, a precise number of property owners can be ascertained from local property records and through other appropriate discovery.

97.     The resolution of the claims of the Class members in a single action will provide substantial benefits to all parties and the Court. It is expected that the Class members will number in the hundreds.

98.     Finally, Class members can be notified of the pendency of this action by Court-approved notice methods.

**Typicality**

99.     Pursuant to Fed. R. Civ. P. 23(a)(3), Plaintiffs' claims are typical of the claims of

Class members and arise from the same course of conduct by Defendants. Plaintiffs' persons,

like all Class members, have been damaged by Defendants' misconduct in that they have

incurred damages and losses related to their use and/or consumption, inhalation, or dermal

absorption of PFOS and/or PFOA from the Defendants' AFFF products and/or exposure to the

PFOS- and PFOA-contaminated water from the 167th Air Wing Shepherd Field Air National

Guard Base.

100.     Furthermore, the factual bases of Defendants' actions and misconduct are

common to all Class members and represent a common thread of misconduct resulting in

common injury to all Class members. The relief Plaintiffs seek is typical of the relief sought for

absent Class members.

**Adequacy of Representation**

101.     Plaintiffs will serve as fair and adequate class representatives as their interests, as

well as the interests of their counsel, do not conflict with the interest of other members of the

Class they seek to represent.

102.     Further, Plaintiffs have retained counsel competent and well experienced in class

action litigation, mass tort litigation, and environmental tort litigation.

103.     Plaintiffs and their counsel are committed to vigorously prosecuting this action on

behalf of the Class and have the financial resources to do so. Neither the Plaintiffs nor their

counsel have interests adverse to the Class.

## Predominance of Common Issues

104.     There are numerous questions of law and fact common to Plaintiffs and Class members that predominate over any question affecting only individual Class members, making it appropriate to bring this action under Rule 23(b)(3). The answers to these common questions will advance resolution of the litigation as to all Class members. These common legal and factual issues include the following:

a.   Whether Defendants engaged in the conduct alleged herein;

b.   Whether Defendants knew or should have known that exposure to PFOS and PFOA could increase health risks;

c.   Whether Defendants knew or should have known that their manufacture of AFFF containing PFOS and PFOA was unreasonably dangerous;

d.   Whether Defendants knew or should have known that their AFFF contained persistent, stable and mobile chemicals that were likely to contaminate groundwater water supplies;

e.   Whether Defendants failed to sufficiently warn users of the potential for harm that resulted from use of their products;

f.   Whether Defendants became aware of health and environmental harm caused by PFOS and PFOA in their AFFF products and failed to warn users and Plaintiffs and the Class of same;

g.   The extent to which Defendants knew about the PFOS and PFOA contamination in the water at the 167th Air Wing Shepherd Field Air National Guard Base;

h.   Whether the Defendants owed a duty to the Plaintiffs and the Class to refrain from the actions that caused the contamination of the water with PFOS and PFOA;

i.  Whether Defendants made unlawful and misleading representations or material omissions with respect to the health impacts of PFOS and PFOA;

j.  For the Medical Monitoring Classes, whether the risk of any health issue or bodily injury of Plaintiffs and the Class are attributable to exposure of PFOS and PFOA in the Defendants' AFFF products and/or to exposure to the PFOS- and PFOA-contaminated water in the City of Martinsburg; and

k.  Whether Plaintiffs and Class members are entitled to damages and other monetary relief and other equitable relief, including but not limited to punitive damages, and if so, in what amount.

### Superiority

105.    The class action mechanism is superior to any other available means of the fair and efficient adjudication of this case. Further, no unusual difficulties are likely to be encountered in the management of this class action. Given that a great number of individuals have been impacted by the Defendants' conduct, it is impracticable for Plaintiffs and the Class to individually litigate their respective claims individually due to the risk of producing inconsistent or contradictory judgments, generating increased delays and expense, and wasting judicial resources. No unusual difficulties are likely to be encountered in the management of this class action. Therefore, the class action mechanism minimizes prospective management challenges and provides the efficiency of a single adjudication under the comprehensive oversight of a single court.

## CAUSES OF ACTION

### COUNT I
### Negligence

106.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

107.    Defendants had a duty to exercise reasonable care in their design, engineering, manufacture, development, fabrication, testing, release, training and response of users, production of informational materials, handling, selling, use, and/or distribution of the inherently dangerous AFFF containing PFAS, including a duty of care to ensure that PFAS did not infiltrate, persist in, and accumulate in the blood and/or body of Plaintiffs.

108.    Defendants owed a duty of care towards Plaintiffs that was commensurate with the inherently dangerous, harmful, injurious, bio-persistent, environmentally-persistent, toxic, and bio-accumulative nature of PFAS.

109.    Defendants failed to exercise ordinary care by acts and/or omissions that permitted, allowed, and/or otherwise resulted in the contamination of, persistence in, and accumulation in the blood and/or body of Plaintiffs with one or more PFAS, including all such acts and/or omissions referenced in this Complaint, resulting in Plaintiffs having one or more PFAS in their blood.

110.    Defendants knew, foresaw, anticipated, and/or should have foreseen, anticipated, and/or known that the design, engineering, manufacture, fabrication, sale, release, training and response of users, production of informational materials, handling, use, and/or distribution of AFFF containing PFAS and/or other acts and/or omissions as described in this Complaint could likely result in the contamination of the blood and/or body of Plaintiffs and its persistence and accumulation in their blood and/or body.

111.     Despite knowing, anticipating, and/or foreseeing the bio-persistent, bio-accumulative, toxic, and/or otherwise harmful and/or injurious nature of AFFF containing PFAS, Defendants, their agents, servants, and/or employees, committed negligent acts and/or omissions that resulted in the contamination of the blood and/or body of Plaintiffs with one or more PFAS materials, and the biopersistence and bioaccumulation of such PFAS in their blood and/or body.

112.     Defendants, through their acts and/or omissions as described in this Complaint, breached their duty to Plaintiffs.

113.     It was reasonably foreseeable to Defendants that Plaintiffs would likely suffer the injuries and harm described in this Complaint by virtue of Defendants' breach of their duty and failure to exercise ordinary care, as described herein.

114.     But for Defendants' negligent and/ or gross negligent acts and/or omissions, Plaintiffs would not have been injured or harmed.

115.     Defendants' negligent conduct was the direct and proximate cause of the injuries and harm to Plaintiffs, as described herein.

## COUNT II
### Battery

116.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

117.     At all relevant times, Defendants possessed knowledge that the AFFF containing PFAS which they designed, engineered, manufactured, fabricated, sold, handled, released, trained users on, produced instructional materials for, used, and/or distributed were bio-persistent, bio- accumulative, toxic, potentially carcinogenic, and/or otherwise harmful/injurious and that their continued manufacture, use, sale, handling, release, and distribution would result in

Plaintiffs having PFAS in their blood, and the biopersistence and bioaccumulation of such PFAS in their blood.

118.    However, despite possessing such knowledge, Defendants knowingly, purposefully, and/or intentionally continued to engage in such acts and/or omissions, including but not limited to all such acts and/or omissions described in this Complaint, that continued to result in Plaintiffs accumulating PFAS in their blood and/or body, and such PFAS persisting and accumulating in their blood and/or body.

119.    Defendants did not seek or obtain permission or consent from Plaintiffs to put or allow PFAS materials into their blood and/or body, or to persist in and/or accumulate in their blood and/or body.

120.    Entry into, persistence in, and accumulation of such PFAS in Plaintiffs' body and/or blood without permission or consent is an unlawful and harmful and/or offensive physical invasion and/or contact with Plaintiffs' persons and unreasonably interferes with Plaintiffs' rightful use and possession of Plaintiffs' blood and/or body.

121.    At all relevant times, the PFAS present in the blood of Plaintiffs originated from Defendants' acts and/or omissions.

122.    Defendants continue to knowingly, intentionally, and/or purposefully engage in acts and/or omissions that result in the unlawful and unconsented-to physical invasion and/or contact with Plaintiffs that results in persisting and accumulating levels of PFAS in their blood.

123.    Plaintiffs, and any reasonable person, find the contact at issue harmful and/or offensive.

124.    Defendants acted intentionally with the knowledge and/or belief that the contact, presence and/or invasion of PFAS with, onto and/or into Plaintiffs' blood serum, including its

persistence and accumulation in such serum, was substantially certain to result from those very acts and/or omissions.

125.    Defendants' intentional acts and/or omissions resulted directly and/or indirectly in harmful contact with Plaintiffs' blood and/or body.

126.    The continued presence, persistence, and accumulation of PFAS in the blood and/or body of Plaintiffs is offensive, unreasonable, and/or harmful, and thereby constitutes a battery.

127.    The presence of PFAS in the blood and/or body of Plaintiffs has altered the structure and/or function of such blood and/or body parts and resulted in serious risk of developing cancers and other health issues.

128.    As a direct and proximate result of the foregoing acts and omissions, Plaintiffs suffered and continue to suffer physical injury for which Defendants are therefore liable.

<u>COUNT III</u>
<u>Strict Liability: Failure to Warn</u>

129.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

130.    This cause of action is brought pursuant to West Virginia law. The West Virginia Supreme Court of Appeals has held that the general test for establishing strict liability in tort was whether the involved product was defective in the sense that it was not reasonably safe for its intended use. The standard of reasonable safeness was determined not by the particular manufacturer, but by what a reasonably prudent manufacturer's standards should have been at the time the product was made. *Morningstar v. Black & Decker Mfg. Co.*, 162 W. Va. 857. (W. Va. 1979).

131.    Defendants knew or should have known: (a) exposure to AFFF containing PFAS was hazardous to the environment and to human health; (b) the manner in which they were designing, manufacturing, marketing, distributing, and selling AFFF containing PFAS was hazardous to human health; and (c) the manner in which they were manufacturing, marketing, distributing, and selling AFFF containing PFAS would result in the contamination of Plaintiffs' blood and/or body as a result of exposure.

132.    Defendants had a duty to warn of the hazards associated with AFFF containing PFAS entering and poisoning the blood and/or body of Plaintiffs because they knew of the dangerous, hazardous, toxic, and poisonous properties of AFFF containing PFAS. Defendants failed to provide sufficient warning to purchasers that the use of their AFFF products would cause PFAS to be released into Plaintiffs and cause the exposure and bioaccumulation of these toxic and poisonous chemicals in the blood and/or body of Plaintiffs.

133.    Adequate instructions and warnings on the AFFF containing PFAS could have reduced or avoided these foreseeable risks of harm and injury to Plaintiffs. If Defendants provided adequate warnings: (a) Plaintiffs could have and would have taken measures to avoid or lessen their exposure; and (b) end users and governments could have taken steps to reduce or prevent the release of PFASs into the blood and/or body of Plaintiffs. Defendants' failure to warn was a direct and proximate cause of Plaintiffs' injuries from PFAS that came from the use, storage, and disposal of AFFF containing PFAS. Crucially, Defendants' failure to provide adequate and sufficient warnings for the AFFF containing PFAS they manufactured, designed, marketed, distributed, and sold renders the AFFF a defective product.

134.    Defendants were negligent in their failure to provide Plaintiffs with adequate warnings or instruction that the use of their AFFF products would cause PFAS to be released into

the blood and/or body of Plaintiffs. As a result of Defendants' conduct and the resulting

contamination, Plaintiffs have suffered, and continue to suffer, severe personal injuries by

exposure to AFFF containing PFAS.

135.    Defendants' negligent failure to warn directly and proximately caused the harm to

and damages suffered by Plaintiffs.

## COUNT IV
## Design Defect

136.    Plaintiffs hereby incorporate by reference the allegations contained in the

preceding paragraphs of this Complaint as if restated in full herein.

137.    Defendants knew or should have known: (a) exposure to AFFF containing PFAS

is hazardous to human health; (b) the manner in which AFFF containing PFAS was designed,

manufactured, marketed, distributed, and sold was hazardous to human health; and (c) the

manner in which AFFF containing PFAS was designed, manufactured, marketed, distributed,

and could and would release PFAS into Plaintiffs and cause the exposure and bioaccumulation of

these toxic and poisonous chemicals in the blood and/or body of Plaintiffs.

138.    Knowing of the dangerous and hazardous properties of the AFFF containing

PFAS, Defendants could have designed, manufactured, marketed, distributed, and sold

alternative designs or formulations of AFFF that did not contain hazardous, toxic, and poisonous

PFAS. These alternative designs and formulations were already available, practical, and

technologically feasible. The use of these alternative designs would have reduced or prevented

the reasonably foreseeable harm to Plaintiffs caused by the Defendants' manufacture, marketing,

distribution, and sale of AFFF containing hazardous, toxic, and poisonous PFAS.

139.    The AFFF containing PFAS that was designed, manufactured, marketed, distributed, and sold by the Defendants was so hazardous, toxic, poisonous, and dangerous to human health that the act of designing, formulating, manufacturing, marketing, distributing, and selling this AFFF was unreasonably dangerous under the circumstances.

140.    The AFFF designed, formulated, manufactured, marketed, distributed, and sold by Defendants was defectively designed and the foreseeable risk of harm could and would have been reduced or eliminated by the adoption of a reasonable alternative design that was not unreasonably dangerous. Defendants' defective design and formulation of AFFF containing PFAS was a direct and proximate cause of the contamination of the blood and/or body of Plaintiffs and the persistence and accumulation of PFAS in their blood and/or body.

141.    Defendants' defective design and formulation of AFFF containing PFAS caused the contamination described herein resulting in a personal injuries to Plaintiffs. As a direct result of the harm and injury caused by Defendants' defective design and the contamination described herein, Plaintiffs have been exposed to AFFF containing PFAS and other toxic substances.

142.    Defendants' negligent failure to design a reasonably safe product directly and proximately caused the harm to and damages suffered by Plaintiffs.

**COUNT V**
**Trespass**

143.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

144.    This cause of action is brought pursuant to the laws of West Virginia.

145.    Defendants manufacture and distributed their products to be used at the 167th Airwing in Martinsburg, West Virginia, with knowledge that large quantities of toxic PFOA and

PFOS would contaminate the air, soil, and groundwater, causing contaminations of various private wells, including Plaintiffs', in various locations, in varying amounts at various times.

146.    Defendants owed Plaintiffs a cognizable duty to exercise reasonable care to ensure that toxic substances being sold to and used at the 167th Airwing were disposed of reasonably and properly so as not to discharge hazardous or toxic substances, including PFOA, into the environment.

147.    At all times relevant to the present cause of action, Defendants, through acts and/or omissions by Defendants in the handling and/or disposal of material contaminated with PFOA and other chemicals, resulted in the contamination of the water supply relied upon by Plaintiffs at all relevant times.

148.    At the time the above-described, affirmative, voluntary, and intentional acts were performed by Defendants, Defendants had good reason to know or expect that large quantities of PFOA would and/or could be introduced into the persons and property of Plaintiffs.

149.    The above-described affirmative, voluntary, and intentional acts were performed with the willful intent to cause PFOA and PFOS to be disbursed onto the land.

150.    Defendants' negligent, reckless, willful, and/or wanton actions and/or intentional failures to act caused an unknown quantity of PFOA and PFOS to be released into the drinking water for the Plaintiffs.

151.    Defendants' willful, wanton, and intentional failure to act and/or their affirmative choices of actions and following courses of actions have caused PFOA and PFOS to enter and trespass upon the land and realty of the Plaintiffs and cause an injury to their possession and/or right of possession.

152.    Plaintiffs have not consented and do not consent to the trespass and contamination alleged herein. Defendants knew or reasonably should have known that the Plaintiffs did not and do not consent to this trespass.

153.    These voluntary actions resulted in the immediate and continued trespass, injury and damage to Plaintiffs, their property and their right of possession of their property.

154.    Further, Defendants' action in introducing unknown quantities of PFOA and PFOS into the groundwater of Berkeley County and, consequently, the persons and property of Plaintiffs were done with actual malice, and in wanton, willful and/or reckless disregard for Plaintiffs' rights, health, and property.

155.     Additionally, and/or alternatively, Defendants' decisions to delay and the resulting delay in taking any affirmative action to eliminate, correct, and/or remedy the PFOA and PFOS release and contamination after having knowledge and notice of said contamination were done with actual malice, and in wanton and/or reckless disregard for the rights, health, and property of Plaintiffs.

156.    Accordingly, Plaintiffs seek general damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries in a sufficient amount to compensate them for the injuries and losses and to restore Plaintiffs to their original position, including but not limited to the difference between the current value of their property and such value if the harm had not been done, the cost of repair and restoration, the value of the use of the continuous trespass, injury to persons which includes but is not limited to pain and suffering and the need for medical monitoring and direct, consequential, and nominal damages flowing from the trespass which are the natural and proximate result of Defendants' conduct in an amount to be proved at trial.

## COUNT VI
## Private Nuisance

157.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

158.    This cause of action is brought pursuant to West Virginia law.

159.    Defendants' reckless, intentional and unreasonable, abnormally dangerous, and/or negligent acts and omissions, as alleged above, resulted in the discharge of PFCs, including PFOA and PFOS, into the environment, contaminating the private wells from which Plaintiffs obtained their drinking water.

160.    The discharge of PFOA and PFOS into the environment resulted in the contamination of the Plaintiffs' groundwater and water supply with hazardous levels of PFOA.

161.    The contamination of the groundwater and water supply constitutes a substantial interference with the right of Plaintiffs and their property.

162.    The inability to use potable drinking water at their residences has caused the Plaintiffs significant inconvenience and expense.

163.    By reason of the foregoing, Defendants are liable to Plaintiffs for the damages that they have suffered as a result of Defendants' actions, the amount of which will be determined at trial, plus reasonable attorneys' fees and costs.

164.    Accordingly, Plaintiffs seek general damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries in a sufficient amount to compensate them for the injuries and losses and to restore Plaintiffs to their original position, including, but not limited to the difference between the current value of their property and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injury to persons, including the need for medical monitoring, and direct, consequential,

and nominal damages flowing from the nuisance and trespass which are the natural and proximate result of Defendants' conduct in an amount to be proved at trial.

**COUNT VII**
**Medical Monitoring**

165.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

166.    Medical monitoring is available to Plaintiffs and Class members who have yet to sustain a present injury as a stand-alone cause of action as the increased risk of developing the diseases and conditions discussed *supra* constitute an injury-in-fact and also as an element of damages associated with Plaintiffs and Class members other claims for those Plaintiffs and Class members who have sustained a present injury.

167.    Under West Virginia law, a claim for medical monitoring requires: (1) plaintiff has been "significantly exposed" "relative to the general population"; (2) to a "proven hazardous substance"; (3) by reason of "tortious conduct" (not just negligence) by the defendant; (4) which exposure has created "an increased risk of contracting a serious latent disease"; (5) which "makes it reasonably necessary for the plaintiff to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of the exposure"; and (6) monitoring "exist[s] that make the early detection of a disease possible." Bower v. Westinghouse Electric Co., 522 S.E.2d at 426 (syllabus at 3).

168.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFC's would result in the contamination of the water supplies of fire training academies, like the 167th AW.

169.    Defendants knew or should have known that exposing humans to PFC-contaminated water would be hazardous to human health and the environment.

170.     Here, the Plaintiffs have been exposed to PFOA, PFOS, and potentially other toxic substances at levels greater than normal background levels of PFOS and PFOA, as a direct and proximate result of their use and/or consumption, inhalation or dermal absorption of PFOS and/or PFOA from the Defendants' AFFF products. The West Virginia DEP's water samples demonstrate that PFOS and PFOA levels detected in the contaminated water supplies at the 167th AW, above the EPA's health-safety level of 70 ppt.

171.     As such, the Plaintiffs Class members are at an increased risk of developing serious adverse health effects that resulted from the use, storage, and discharge of AFFF at the 167th AW.

172.     As described more fully above in this Complaint, PFOA and PFOS exposure leads to the bioaccumulation of PFOA and PFOS in the blood, seriously increasing the risk of contracting serious adverse and latent diseases, including, but not limited to, kidney and testicular cancer and related diseases, liver damage, thyroid disease, ulcerative colitis, immune effects and deficiencies, and/or developmental effects to fetuses during pregnancy or to breastfed infants, as a result of being exposed to PFOS and/or PFOA emitted from each Defendant's products. Medical tests currently exist that can determine the level of PFOS and PFOA in the blood.

173.     Given that exposure to and bioaccumulation of PFOA and PFOS significantly increases the risk of contracting a serious medical condition, periodic medical examinations to detect latent diseases are both reasonable and necessary. A thorough medical monitoring plan, following common and accepted medical practices, can and should be developed for the Plaintiffs and the Classes to assist in the early detection and beneficial treatment of the diseases that can develop as a result of exposure to PFOS and PFOA.

174.    Medical monitoring and testing protocols and procedures exist that make the early detection of the diseases correlated to the exposure to PFOS and PFOA possible and beneficial. These may include a comprehensive medical questionnaire completed by the patient; periodic and comprehensive medical examinations by qualified licensed medical professionals; and specific testing based on the patient's history, PFOS and/or PFOA exposure, symptoms or health consequences, clinical considerations and/or medical examination results. Available laboratory testing includes but is not limited to testing of biomarker and organ system function.

175.    For the early detection of the latent diseases alleged herein, the qualified licensed medical professionals may utilize specific evaluations and/or laboratory testing of biomarker and organ system function as follows:

a.   Thyroid Function

     i.    Thyroid stimulating hormone (TSH); and
     ii.   Free thyroxine (FT4)

b.   Liver function:

     i.    Albumin;
     ii.   Aspartate Aminotransferase (AST/SGOT);
     iii.  Alanine Aminotransferase (ALT/SGPT);
     iv.   γ-glutamyltransferase (GGT);
     v.     Bilirubin; and
     vi.   Alkaline Phosphatase

c.   Uric Acid:

     i.    Serum

d.   Kidney Cancer:

     i.    Urinalysis

e.   Lipids:

     i.    Total Cholesterol;
     ii.   High-density lipoprotein (HDL);

      iii.    Low-densitylipoprotein (LDL); and

      iv.    Total triglycerides

f.   Evaluation for testicular cancer:

      i.    Scrotal ultrasound followed by radiographic testing, measurement of serum tumor markers;

      ii.    Radical inguinal orchiectomy; and/or

      iii.    Retroperitoneal lymph node dissection

g.   Evaluation for kidney cancer:

      i.    Urine culture

      ii.    Ultrasound of kidneys;

      iii.    Abdominal pelvic CT scan; and/or

      iv.    Cystoscopy

h.   Reproductive/infertility issues:

      i.    Evaluation by a fertility specialist if, after 12 months, a couple has failed to conceive

i.   Gestational hypertension:

      i.    Screening for evidence of gestational hypertension and pre- eclampsia for women in their second and third trimesters of pregnancy

j.   Androgen dysregulation:

      i.    Evaluations to assess androgen levels

k.   Indication of ulcerative colitis:

      i.    Evaluation of erythrocyte sedimentation rate;

      ii.    Evaluation of serum C-reactive protein; and/or

      iii.    Colonoscopic evaluation

176.    Using the data collected from comprehensive medical questionnaires completed by the patients, periodic and comprehensive medical examinations, laboratory testing and results, and other specialized evaluations, as alleged herein, qualified licensed medical professionals may

predict, detect, and treat these diseases early, thus benefiting the Plaintiffs and Class Members and reducing the likelihood of their premature morbidity, disability, or mortality.

177.    Accordingly, Plaintiffs and the Classes seek damages from the Defendants, including an order requiring them to fund a medical monitoring program to be created, supervised and implemented by the court.

## COUNT VIII

### Punitive Damages

178.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

179.    Upon information and belief, Defendants engaged in willful, wanton, malicious, and or/reckless conduct that was done without regard to the consequences or the safety of Plaintiffs and caused the foregoing injuries upon Plaintiffs, disregarding their protected rights.

180.    Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to Defendants' failure to take all reasonable measures to ensure Plaintiffs were not exposed to PFAS which Defendants knew were linked to serious medical conditions.

181.    Defendants have caused significant harm to Plaintiffs and have demonstrated a conscious and outrageous disregard for their safety with implied malice, warranting the imposition of punitive damages.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the Court enter judgment against the Defendants on each of the above-referenced claims as follows:

(a)  Finding Defendants jointly and severally liable for past, present and future damages suffered by Plaintiffs;

(b)  Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

(c)  Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determined at trial of this action;

(d)  Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiffs in an amount sufficient to punish Defendants and deter future similar conduct; an order finding Defendants liable for conspiracy in the manner described herein;

(e)  Medical Monitoring;

(f)  Prejudgment interest;

(g)  Post judgment interest;

(h)  Awarding Plaintiffs reasonable attorneys' fees when applicable;

(i)  Awarding Plaintiffs the costs of these proceedings; and

(j)  Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury as to all issues.

Date:   May 3, 2021

/s/ Stephen G. Skinner
Stephen G. Skinner (WVSB No. 6725)
SKINNER LAW FIRM
PO BOX 487
Charles Town, WV 25414
304-725-7029
sskinner@skinnerfirm.com
pellegrin@skinnerfirm.com

/s/ Anthony J. Majestro
Anthony J. Majestro (WVSB No 5165)
POWELL & MAJESTRO, PLLC
405 Capital Street, Suite P-1200
Charleston, WV 25301
(304) 346-2889
amajestro@powellmajestro.com